RAT:NB
F.#

**M 10-1210**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

GARY MONGE, also known as
    "Lou" and
MARIO RUIZ, also known as
    "Pete,"

            Defendants.

- - - - - - - - - - - - - -X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANTS

(T. 21, U.S.C., § 846)

EASTERN DISTRICT OF NEW YORK, SS:

        MICHAEL ANTONUCCI, being duly sworn, deposes and says

that he is a Special Agent with the Drug Enforcement

Administration ("DEA"), duly appointed according to law and

acting as such.

        Upon information and belief, in or about and between

November 2009 and June 2010, both dates being approximate and

inclusive, within the Eastern District of New York, the

defendants GARY MONGE, also known as "Lou" and MARIO RUIZ, also

known as "Pete," together with others, did knowingly and

intentionally conspire to distribute and possess with intent to

distribute one or more controlled substances containing (a) 28

grams or more of a substance containing cocaine base, a Schedule

II controlled substance, and (b) a substance containing cocaine,

a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Section 846).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.   I have been a Special Agent with the DEA for approximately fifteen years and I am currently assigned to the Long Island District Office.   I have participated in numerous investigations into the unlawful possession, distribution and manufacture of controlled substances, including but not limited to cocaine and cocaine base (commonly referred to as "crack cocaine").   Many of these investigations involved working with confidential informants and cooperating witnesses, surveillance and controlled purchases of narcotics.   The information contained in this affidavit comes from first-hand knowledge, my discussions with witnesses involved in the investigation, my discussions with other agents and officers, and a review of the evidence related to this investigation.

2.   The facts set forth in this affidavit are based in part on information that I have learned from conversations with narcotics detectives with the Suffolk County Police Department

---

[1]   Because the purpose of this Affidavit is solely to set forth probable cause to arrest the defendant, I have not set forth all facts concerning this investigation of which I am aware.

2

("SCPD") concerning a confidential informant ("CI"), who has proven to be reliable.  Specifically, during the course of the investigation, the information provided by the CI has been corroborated by a number of other sources, including other witnesses, physical surveillance, video recordings and audio recordings.

      3.  As part of this investigation, the SCPD AND DEA have participated in at least two controlled purchases of cocaine base and four purchases of cocaine that involved the defendants GARY MONGE, also known as "Lou" and MARIO RUIZ, also known as "Pete."  The purchases of cocaine took place on November 16, 2009, November 19, 2009, December 1, 2009 and December 8, 2009, respectively.  The purchases of cocaine base occurred on May 25, 2010 and June 2, 2010.  All six transactions took place in the vicinity of Islandia, New York, were recorded using video and audio technology, and were monitored by members of law enforcement.

      a.  On November 16, 2009, the CI acting at the direction of an undercover narcotics detective ("UC #1") with the SCPD called (631) 575 3185 (Cell Phone #1) and spoke to an individual named "Pete" about a proposed narcotics transaction. "Pete" agreed to provide the CI with 20 grams of cocaine in exchange for $1,000.00 during the ensuing monitored phone conversation.  The CI and "Pete" agreed to meet that same day in

the area of Route 495 in Islandia, New York to conduct the
transaction.  UC #1 then drove the CI in an undercover police
vehicle to the pre-arranged meet location where the CI called
"Pete" on Cell Phone #1 to let him know that they had arrived.
"Pete" called the CI approximately 15 minutes later from Cell
Phone #1 and told the CI that he would be driving a white Colored
Nissan Altima and directed the CI to follow him in his/her
vehicle.  "Pete" drove a short distance away and stopped.  After
UC #1 followed suit in the unmarked police vehicle, "Pete"
maneuvered his vehicle next to the undercover vehicle and threw a
clear plastic wrapper containing a hard light colored substance
into the open driver's side window of the undercover vehicle.  UC
#1 then retrieved the substance, weighed it and saw that it was
less than the agreed upon 20 grams.  "Pete" then exited his
vehicle and got into the rear seat of the undercover vehicle.
After being confronted with the fact that the previously thrown
hard light colored substance weighed less than the agreed upon
amount, "Pete" handed UC #1 an additional quantity of a hard
light colored substance wrapped in a clear plastic bag in
exchange for $1,000.00 in pre-recorded buy money.[2]  RUIZ then
exited the vehicle and left the scene.  The two hard light
colored substances contained in the clear plastic bags that
"Pete" provided to UC #1 were later tested by the Suffolk County

_____

    [2]  Members of the SCPD recorded the serial numbers on all of
the United States currency used to purchase the cocaine.

4

Crime Lab and found to contain cocaine.   The entire transaction was captured on audiotape by the SCPD.   UC #1 identified "Pete" as defendant MARIO RUIZ subsequent to the transaction.[3]

        b.   On November 19, 2009, UC #1 called Cell Phone #1 and spoke to RUIZ about a proposed narcotics transaction. During the ensuing phone conversation RUIZ agreed to provide UC #1 with 20 grams of crack cocaine in exchange for $1,040.00 and arrangements were made to meet in a residential area of Ronkonkoma, New York.   Later that same afternoon UC #1 arrived at the pre-arranged meeting place and placed a call to RUIZ on Cell Phone #1 to let him know that he had arrived.   Shortly, thereafter, RUIZ arrived operating a blue Ford Explorer.   UC #1 parked his undercover vehicle and got into the front passenger seat of RUIZ's vehicle.   Once inside the vehicle, RUIZ handed UC #1 a clear plastic wrapper containing a compressed white powder and UC #1 handed RUIZ $1040.00 in pre-recorded buy money.   UC #1 drove away from the location after the narcotics transaction. The substance contained in the clear plastic wrapper that RUIZ provided to UC #1 was later tested by the Suffolk County Crime Lab and found to contain powder cocaine.   The entire transaction

---

    [3]   After the transaction, UC #1 ran the registration plate on the Nissan Altima that "Pete" conducted in the vehicle with the New York State Department of Motor Vehicles database.   The registered owner of the Nissan Altima was listed as a Jennie Ruiz.   UC #1 then learned that defendant RUIZ had received a ticket in the Nissan Altima on November 29, 2006.   UC #1 obtained a photograph of RUIZ a SCPD database and positively identified him as the individual who sold him cocaine on November 16, 2009.

was captured on audiotape by the SCPD.

   c. On November 30, 2009, UC #1 again called Cell Phone #1 to discuss a narcotics transaction. RUIZ answered the phone, informed UC #1 that he was "dropping off the phone" and that UC #1 should call back in a half hour. Thereafter on November 30, 2009, UC #1 called Cell Phone #1 on three occasions and attempted to get back into contact with RUIZ. The first call went unanswered and the next two calls were preempted by messages indicating that the number was no longer in service. After hearing that Cell Phone #1 was no longer in service, UC #1 attempted to contact RUIZ on (631) 813-7321 (hereinafter, "Cell Phone #2.[4]"

   d. On December 1, 2009, UC #1 called the Cell Phone #2 and spoke with GARY MONGE. During the ensuing conversation, MONGE negotiated a cocaine transaction with UC #1 and then asked UC #1 how he "got to meet us." The call ends with UC #1 agreeing to call back later. Thereafter UC #1 called MONGE back on Cell Phone #2 that same day and they negotiate a price for "straight soft" cocaine. During the final call on December 1, 2009, on Cell Phone #2, MONGE made arrangements for UC #1 to meet MONGE in Suffolk County, New York to complete the narcotics sale. MONGE agreed to provide UC #1 with 70 grams of cocaine for $3080.00 and directed UC #1 to a location in Islandia, New York.

_____

  [4] Previously, the CI informed UC #1 that RUIZ and another individual that he identified as "Lou," utilized Cell Phone #1 and Cell Phone #2 interchangeably to distribute narcotics.

Thereafter, MONGE kept speaking with UC #1 on the Cell Phone #2 until MONGE arrived at the location driving a blue Ford Explorer with an unknown license plate.[5]   MONGE drove the Ford Explorer up to the unmarked vehicle that UC #1 was sitting in so that the front driver's sides of both vehicles were directly adjacent to one another.   After introductions were made, MONGE confirmed to UC #1 that he was the individual who he had been speaking with on the Cell Phone #2.   Thereafter, MONGE handed UC #1 a clear plastic bag containing powder cocaine through the open car windows to UC #1 in exchange for $3080.00 in prerecorded buy money.[6]   The substance contained in the clear plastic that MONGE provided to UC #1 was later tested by the Suffolk County Crime Lab and found to contain powder cocaine.

     e.   On December 8, 2009, UC #1 placed a telephone call to Cell Phone #1 in which MONGE discussed selling cocaine to UC #1.   During the telephone conversations on Cell Phone #1, MONGE agreed to provide UC #1 with 100 grams of cocaine for $4,000.00.   MONGE made arrangements to meet UC #1 in the area of Islandia, New York to complete the narcotics sale.   After UC #1 drove to the previously agreed upon meeting place, he/she received a call from RUIZ on Cell Phone #1 in which RUIZ

---

[5]   The ensuing transaction between MONGE and UC #1 was recorded by members of the Suffolk County Police Department with both audio and videotape.

[6]   Subsequent to the narcotics transaction, UC #1 obtained a previous arrest photograph of MONGE and confirmed that he was the same individual who sold cocaine to him/her on December 8, 2009.

indicated that he was on his way and would be there shortly. Approximately 5 minutes later, RUIZ arrived at the location driving a blue Ford Explorer with New York license plate number EFP9457.[7]  RUIZ parked his vehicle at the location and got into the front passenger seat of the vehicle that UC #1 was sitting in.  RUIZ then removed two zip lock bags containing cocaine from his pocket and handed them to UC #1.  UC #1 then weighed and inspected the cocaine and told RUIZ that the cocaine appeared to be less than the agreed upon amount of 100 grams.  RUIZ then called MONGE on the Cell Phone #2 and when MONGE called RUIZ back, RUIZ handed Cell Phone #2 to UC #1.[8]  MONGE told UC #1 that he weighed the cocaine himself and it weighed the agreed upon amount of 100 grams.  UC #1 then agreed to accept the provided cocaine for the previously agreed upon price of $4,000.00.  As UC #1 was driving away from the transaction he received a call from MONGE re-affirming that the provided cocaine was of good quality and was the proper weight.

     f.  On May 25, 2010, UC #1 called Cell Phone #2 and engaged in a conversation with MONGE in which MONGE agreed to sell UC #1 30 grams of crack cocaine.  Thereafter, UC #1 met with

---

[7]  The ensuing transaction between RUIZ and UC #1 was recorded by members of the Suffolk County Police Department on both audio and videotape.  According to the New York State Department of Motor Vehicle, the registered owner of the blue Ford Explorer was an Evelyn Ruiz.

[8]  Toll analysis corroborates that the Cell Phone #2 participated in both an outgoing and incoming call at that time with (631) 813-7321.

8

MONGE at a pre-arranged location in Suffolk County, New York and MONGE provided UC #1 with approximately 30 grams of crack cocaine in exchange for $1,350.00 in United States Currency.   The substance that was purchased from MONGE on May 25, 2010, was brought to the DEA laboratory and tested positive for the presence of cocaine base.

g.   On June 2, 2010, UC #1 called Cell Phone #2 and engaged in a conversation with MONGE in which MONGE agreed to sell UC #1 50 grams of crack cocaine.   Thereafter, UC #1 met with MONGE at a pre-arranged location in Suffolk County, New York and MONGE provided UC #1 with approximately 50 grams of crack cocaine in exchange for $2,250.00 in United States Currency.   The substance that was purchased from MONGE on June 2, 2010, was brought to the DEA laboratory and tested positive for the presence of cocaine base.

4.   The investigation into the illegal activities of the defendant GARY MONGE, also known as "Lou" and Mario RUIZ, also known as "Pete," and other subjects is continuing. Disclosure of the contents of this application and any subsequently issued arrest warrants may (1) lead to destruction of evidence, (2) flight of the defendants GARY MONGE, Mario RUIZ and other subjects of the investigation, (3) present a risk of danger to the CI or other witnesses, and (4) otherwise jeopardize the continued investigation of this matter.

WHEREFORE, your deponent respectfully requests that

arrest warrants be issued for the defendants GARY MONGE, also known as "Lou," and Mario RUIZ aka "Pete" so that they may be dealt with according to law.

In addition, it is respectfully requested that this Affidavit and the arrest warrants be filed under seal.

MICHAEL ANTONUCCI
Special Agent
Drug Enforcement Administration

Sworn to before me this
15 day of October, 2010

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK